*In re* MARRIAGE OF JACK D. SCOVILLE, Petitioner and Counterrespondent-Appellee, and LINDA SCOVILLE, Respondent and Counterpetitioner-Appellant.

Fifth District   No. 5—91—0042

Opinion filed August 28, 1992.

Elizabeth Levine Levy, of Levy & Levy, P.C., of Collinsville, for appellant.

John Baricevic, of Belleville, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

Linda Scoville appeals from a judgment of dissolution of marriage, contesting the trial court's division of property, the award of mainte-

nance and child support, and the award of attorney fees and costs. We reverse and remand.

The parties were married in December of 1968 and their child was born in 1978. On December 20, 1990, the trial court entered an order dissolving the marriage and awarding custody of the child to Linda, 48, and visitation to Jack, 53. The court ordered Jack to pay maintenance in the amount of $450 per month for four years and retained jurisdiction to review maintenance not later than four years from the date of judgment. Jack was also ordered to maintain Linda on his health insurance during this period and to pay one-half of the premiums for her coverage. The trial court further ordered Jack to pay child support of $750 per month, to provide medical and dental insurance for the child and to pay all medical and dental expenses of the child not covered by insurance. Linda's attorney fees and costs totaled $10,203.53. Jack was also required to pay $4,000 of that total.

Because the issues on appeal concern the division of property, we will begin by examining the trial court's distribution of the property using the chart below.

## TRIAL COURT'S DISTRIBUTION OF PROPERTY

### KEY
| | |
|---|---|
| * | Value stipulated to by the parties. |
| ** | No finding of value by court but undisputed in record. |
| *** | No finding of value by court and disputed in record. |
| **** | The parties stipulate as to the current value but dispute the classification of this asset. |

Property Assigned or Awarded to Husband

| Nonmarital | Value |
|---|---|
| Husband's interest in Pike County land including interest in Scoville estate and property gifted to him which is marital | no finding *** |
| Guns | no finding |
| Gross Avenue lot in East St. Louis | $ 1,500 ** |
| Coffee table in sunroom | no finding |

| Marital | |
|---|---|
| (a) BBJJ land trust (Stages nightclub) | no finding *** |
| (b) Magna Trust 6511 (Popeye's) | no finding *** |

| | |
|---|---|
| (c) Oak Glen apartments | no finding *** |
| (d) 1989 income tax overpayment on parties' personal tax return | $11,000 ** |
| (e) IRA in husband's name | $29,914 * |
| (f) Dow Chemical stock (both parties) | $11,795 * |
| (g) ½ interest in hog barn | no finding *** |
| (h) ⅕ interest in lot (Tim & Joe's) | no finding *** |
| (i) ½ of 1986 tax refund | $ 5,857 * |
| (j) ½ Magna Group stock | $15,592 * |
| (k) ½ Mark Twain stock— value as of 6-1-99 | $12,675 * |
| (l) ½ of 1989 tax overpayment, J. Scoville, Ltd. | $ 500 ** |
| (m) Oriental rug | no finding *** |
| (n) Household furniture and furnishings in husband's possession | no finding *** |
| (o) ½ interest in a boat | $ 3,600 ** |
| (p) 1987 Bronco automobile | $ 7,000 * |
| (q) Husband's share of proceeds from hospital contents investment | $ 5,250 ** |
| (r) First & St. Clair property | $ 4,500 * |

**Misc.**

| | |
|---|---|
| Certificate of deposit— Jack Scoville, Ltd. | $17,083 **** |

**Marital Debt Assigned to Husband**

| | |
|---|---|
| Policy loan against cash value of life insurance awarded to wife | $ 6,945 |
| 25% share of $980,000 debt on Magna Trust 6511 (Popeye's) | $245,000 |
| 40% share of $50,000 loan to BBJJ land trust (Stages) made 8-6-90 | $ 20,000 |
| Note payable to acquire 15% interest in Stages | $ 35,000 |
| Note on Oak Glen apartments | $160,000 |

**Property Assigned or Awarded to Wife**

| Nonmarital | Value |
|---|---|
| 1983 Mustang automobile | $ 4,000 * |
| Jewelry | no finding |

| | |
|---|---|
| Secretary from the living room | no finding |
| Saddle mirror in basement | no finding |
| Dresser in child's room | no finding |

**Marital**

| | |
|---|---|
| (a) Keough at Mark Twain | $ 1,195 * |
| (b) IRA in wife's name | $34,763 * |
| (c) Cash value in life insurance | $10,099 * |
| (d) Cash value in life insurance ($11,944 minus loan amount of $6,945) | $ 4,999 * |
| (e) Hunter garage property (amount due from purchaser) | $14,570 * |
| (f) 1984 station wagon | $ 2,000 |
| (g) Marital residence with household furnishings | no finding *** |
| (h) ½ of 1986 tax refund | $ 5,857 |
| (i) ½ of 1989 tax refund owed to Jack Scoville, Ltd. | $ 500 ** |
| (j) ½ of Magna Group stock | $15,592 * |
| (k) ½ of Mark Twain stock— value as of 6-1-99— | $12,675 * |
| (l) Real estate account— First Illinois Bank | $ 509 ** |
| (m) Oil painting | no finding |

**Marital Debt Assigned to Wife**

| | |
|---|---|
| Dillards | $ 280 |
| Summer camp | $ 487 |
| St. John's Hospital | $ 1,200 |

Because there is no real dispute between the parties as to the classification of the property listed as nonmarital, we will not dwell on the testimony concerning those assets. After a review of the record we further believe that those assets whose values were either stipulated to by the parties or were undisputed in the record need no further discussion. Also, with the exception of the $17,083 certificate of deposit from the sale of the restaurant equipment, there is no specific dispute as to the classification of the assets. Therefore, the balance of our discussion of assets will deal with those from which there was no stipulation, where there is a dispute and the court made no finding as to the value.

Jack Scoville was the primary breadwinner, and Linda Scoville basically assumed the role of the traditional housewife and mother. The Scovilles' principal source of income was from business ventures and various investments.

Jack holds a 25% interest in the Illinois State Land Trust 6511 (land trust). The assets of the land trust include two parcels of real estate, one located in Columbia, Missouri, the other in Fairview Heights, Illinois. The land trust rents its property to the Dardene Corporation, which operates a Popeye's restaurant at each location. Jack is president of the Dardene Corporation. The gross rents paid by the corporation to the land trust were $133,000 in 1986, $193,000 in 1987, $156,500 in 1988, and $115,600 in 1989. Rents from the Dardene Corporation provide the only source of income to the land trust. The United States fiduciary income tax returns for the land trust show total income of $39,080 for 1986 and of $11,397 in 1987. The tax returns for the corporation show that the land trust sustained losses of $67,656 and $116,460 in 1988 and 1989. $105,003 of the loss sustained in 1989 was attributed to depreciation.

Jack testified that the Dardene Corporation functions solely as the operating entity for the two Popeye's restaurants. He testified that he owns a 25% interest in the Dardene Corporation. However, Jack's bookkeeper of 17 years, Delores Buttry, testified that Jack is the sole shareholder of the Dardene Corporation. Jack testified that as a 25% shareholder in the land trust, he owes one-quarter of the land trust's indebtedness to Magna Bank, or $245,000. At the time of the hearing on the property distribution in August 1990, Jack testified that business had been down at the restaurants; the business at the Popeye's in Fairview Heights had decreased 12% from the year previous, while the Columbia Popeye's had sustained its earnings.

Jack testified that he values the Fairview Heights Popeye's at $800,000 and the Columbia Popeye's at $600,000. Jack and his partners paid $650,000 for the Fairview Heights operation and $700,000 for the Columbia operation. Jack testified that for the past 18 months he and his business partners have actively sought a purchaser for the Columbia store. At one point a purchaser was interested, and the partners were willing to sell the property at Columbia, at a $300,000 loss, but the purchaser was unable to obtain financing.

Another business venture which provides Jack a major source of income is Stages Nightclub, otherwise referred to as the BBJJ Land Trust. Jack held a 25% interest in the venture until 1988 when he purchased an additional 15% interest from William Killian. Jack owes Killian $35,000 for that purchase.

Jack testified that the only indebtedness on the Stages property is a $50,000 loan which was made in August 1990 in order to remodel the nightclub. Jack admitted that in the April 1990 financial statement he prepared in order to obtain a bank loan, Stages is valued at $800,000, which would make his share in the property worth $320,000. Jack testified, however, that his financial statement reflected an overvaluation of the property, and that the actual value of his interest in the property is $200,000. In his February 1990 financial statement Jack projected that the 1990 income from Stages would be $80,000. In September of 1990 he testified that this projection was inaccurate because during the first eight months of 1990, Stages realized an income of only $30,000. Jack testified that the bulk of his income is derived from Stages; however, due to decreasing profits he had not had a dividend from there since April of 1990. According to BBJJ Land Trust tax returns, Stages' gross income decreased in 1989 as compared to years previous. In 1985 the gross income of the BBJJ Land Trust was $206,274; in 1986 $290,633; in 1987 $262,735; in 1988 $274,815; and in 1989 $144,769. According to Jack's personal financial statement, his monthly income from Stages dropped from $5,000 to $2,000.

The parties purchased several pieces of real estate during the marriage, and they stipulated that a parcel located at First and St. Clair had a value of $4,500. Jack also holds a one-fifth interest in a vacant lot referred to as "Tim and Joe's lot." Jack testified that this vacant lot has been for sale for two years at an asking price of $135,000, but no one has expressed an interest in purchasing the property. Jack paid $12,000 for his one-fifth interest in the lot. There is no outstanding mortgage on the property.

The Oak Glen apartments in Belleville is yet another real estate investment. Jack testified that he owes the entire mortgage of $155,000 on the property, and that the monthly mortgage payment is $1,633. He testified that in 1989 he had to pay $11,200 for taxes and insurance on the property and that the apartments are operating at a loss. There are eight apartments in the complex with rents ranging from $275 to $333. The net receipts for the Oak Glen apartments admitted into evidence were: January 1990—$1,699; April 1990—$272; June 1990—$936; July 1990—$892; and August 1990—$615.

The parties stipulated that the property known as the Gross Avenue lot is classified as nonmarital property because Jack purchased it prior to the marriage. Jack testified that this is a vacant lot and is valued at approximately $1,500. The parties also stipulated that some property located in Pike County and a one-eighth interest in a hog

barn there were nonmarital property because they were awarded to Jack through his father's estate. In addition to the one-eighth nonmarital interest Jack holds in the hog barn through his father's estate, Jack owns a one-half marital interest in the hog barn. Jack purchased a one-half interest in the hog barn in 1983 for $26,500. He testified that he receives approximately $300 net per month in rent from the tenants on the property. Jack had an offer to buy the property at $40,000, but he turned it down because he is asking $84,000 for the place.

The Hunter garage property was purchased by the parties during the marriage, and Jack testified that it was recently sold bond-for-deed. The parties stipulated that as of August 1990, the balance due on the purchaser's note was $14,570, and the last $400 payment was due from the purchaser on September 1, 1994.

There was some dispute about the classification of a certificate of deposit in the business known as Jack Scoville, Ltd. (Scoville Cafe). The court made no finding as to the classification of the asset but awarded it to Jack, whose family established the Scoville Cafe in 1929. Jack's brother-in-law and partner in the business, Charlie Chatham, quit in 1972. Charlie wanted nothing for his share in the business, so Jack did not have to pay for Charlie's interest. In 1974 Jack incorporated the business. Jack testified that he held 80% and Linda held 10% of the stock. Jack was president of the corporation and performed services with respect to the corporation. Linda was named as secretary-treasurer of the corporation and at times worked as a cashier at the cafe. Jack testified that when Linda worked she was on the payroll and received an hourly wage.

In approximately 1984 the business was sold. The corporate tax return for 1988 shows total assets of Jack Scoville, Ltd., of $44,283. Jack's bookkeeper, Delores Buttrey, testified that of the reported assets, $26,000 is represented by a note made payable by the purchaser of the restaurant. Buttrey and Jack both testified that the note is uncollectible. The only realized net asset of the business is a certificate of deposit valued at $17,083 as of December 1989. This certificate of deposit represents the proceeds of an auction of equipment used in the operation of the Scoville Cafe. As of July 31, 1990, Jack had spent $13,075 of that account. There was little if any testimony as to how the money was used.

The fair market value of the marital home was stipulated by the parties at $125,000 to $128,000, with the parties free to admit evidence demonstrating a lesser or higher value on the home. Jack's personal financial statement prepared by him and submitted to the First

Illinois Bank just seven months prior to the hearing shows the value of the home at $150,000. The home was built in 1947. There is no outstanding mortgage on the home. Linda lives in the residence with her daughter.

Jack testified that the roof is 19 years old, the furnace is 15 years old, and the air conditioner was replaced between 1982 and 1984. Photographs of needed repairs were admitted into evidence. The photographs and Linda's testimony demonstrate that there is a crack in the master bedroom closet and that the ceiling in the living room is deteriorating and needs replastering. Linda testified that the living room ceiling is adjacent to her bedroom closet, and it appears as if the cracked walls and the deteriorated ceiling problems are related. The ceiling in the guest bathroom has a moisture problem, and the paint is peeling. The garage ceiling and the outside trim need scraping and painting. All the window frames in the house are in need of repair. Linda also testified that the basement shower leaks and that a water pipe which was damaged when the parties remodeled causes problems. The basement carpet is deteriorated and needs replacing.

Linda testified that the damage to the residence has worsened since the parties separated. She has made minimal repairs to the residence because of her financial situation; however, she did scrape a portion of the garage ceiling and had an electrician and a plumber perform a few minor repairs. Both parties testified that if the repairs are made on the home its fair market value will increase, but that if no repairs are made the fair market value will decrease.

With regard to the household possessions, Linda testified that she destroyed an oil painting which was purchased during their marriage. She did not know what the painting was worth. Jack testified that he paid $500 for the painting.

Jack states in his brief that he accepts the values of the household furnishings as stated in the wife's response to interrogatories: $3,699 in the wife's possession, and $4,220 in the husband's possession. Jack argues, however, that the microwave oven purchased by Linda for $366 in 1989 should be added to the list of property in her possession. Furthermore, Jack argues that the $500 oil painting which Linda destroyed should be included in her list of furnishings.

Another item of personalty, whose value is disputed, is the oriental rug. Jack purchased the rug in the spring of 1990 for $1,100. He hopes to sell the rug for $2,500, but he has had no offer.

As for the parties' current living arrangements, Jack is renting an apartment for $440 per month. His personal financial statement shows his net worth at $1,647,088. Jack testified that this amount is exagger-

ated because when he prepared it he overvalued his assets in order to obtain a loan. Jack testified that his income is basically derived from Stages Nightclub. Although he holds an interest in the Pike County real estate through his father's estate, Jack testified that his mother receives all the income from that property. Jack's personal financial statement shows the value of the Pike County real estate at $3 million and shows Jack as having a 25% interest in the property. Jack testified that he could "make a case" for the value of $3 million but that this was simply an arbitrary figure he had assigned to the property. Jack testified that he receives $1,000 per month in farm rental income from other property also bequeathed to him by his father.

When the parties married, Linda was working for Dow Chemical as a clerk. She worked there for five years before going to work at the State's Attorney's office for a year. She then worked as a clerk for the Teamsters for approximately six years. When their daughter was born, both Jack and Linda decided that Linda should stay home to care for the child. Linda worked as a homemaker for 14 years and did the family shopping, meal preparation, house cleaning, child care, and house management. Occasionally, Linda would work as a cashier at Scoville's Cafe, and she would substitute for Jack's secretary when his secretary was on vacation.

Linda has no special training or skills and is currently employed as a department store sales clerk earning $5 an hour. Linda testified that she earns approximately $383 per month and receives no benefits. Linda is currently enrolled in a three-year nursing program and hopes to earn a nursing degree. Linda has five college credits and anticipates it will take her three years to earn her degree if she is able to attend full time. It will take five years if she is required to attend part time. The three-year nursing program includes one year of liberal arts studies. The estimated cost of the remaining two years in the nursing program is $4,362.40. While she is working or attending school, Linda pays a babysitter $2 an hour to stay with her daughter.

Linda testified that since the separation her style of living has changed. She has cut back on expenses and tries to live within a budget. During the marriage, Linda did not have to concern herself with such matters as Jack provided sufficient income to meet the parties' needs. Since the parties separated, Linda has incurred a department store bill of $280 for clothing for her daughter. Linda owes $487 for her child's summer camp. She also owes St. John's Hospital $1,200 for a program on alcoholism in families. Linda testified that she contributes approximately $125 per month to her church. She testified that she has cut back on contributions to other organizations

even though she frequently made such contributions when she was married.

The first issue on appeal concerns the trial court's division of property. Linda argues that the trial court abused its discretion in distributing the property because she received a substantially disproportionate award.

■ Under section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (the Act), the court is directed to divide marital property upon dissolution of marriage in "just proportions considering all relevant factors." (Ill. Rev. Stat. 1991, ch. 40, par. 503(d).) One relevant factor the court considers is the value of the property set apart to each spouse. (Ill. Rev. Stat. 1991, ch. 40, par. 503(d)(2).) While the division of property should never be reduced to pure numbers, under certain circumstances unequal proportions are an indication that the marital estate is inequitably distributed. *In re Marriage of Hobbs* (1982), 110 Ill. App. 3d 451, 456, 442 N.E.2d 629, 632.

While the trial court did not make a specific listing of its award of the various assets to the respective parties, it is clear from the record that the following listing is an accurate summary of the court's award of the marital property. The trial court also failed to assign a value to several of the assets, some of which have substantial value. From the testimony and the exhibits we can estimate a range of values for each asset.

| Jack's Marital Assets | Highest value | Lowest value |
| --- | --- | --- |
| (a) BBJJ land trust (Stages) | $320,000 | $200,000 |
| (b) Magna Trust 6511 (Popeye's) | $350,000 | $300,000 |
| (c) Oak Glen apartments | $160,000 | $160,000 |
| (d) 1989 personal income tax overpayment | $ 11,000 | $ 11,000 |
| (e) IRA in husband's name | $ 29,914 | $ 29,914 |
| (f) Dow Chemical stock | $ 11,795 | $ 11,795 |
| (g) ½ interest in hog barn | $ 42,000 | $ 42,000 |
| (h) ⅕ of a lot (Tim & Joe's) | $ 27,000 | $ 12,000 |
| (i) ½ of 1986 tax refund | $ 5,857 | $ 5,857 |
| (j) ½ Magna Group stock | $ 15,592 | $ 15,592 |
| (k) ½ Mark Twain stock— value as of 6-1-99 | $ 12,675 | $ 12,675 |
| (l) ½ of 1989 Scoville, Ltd., tax overpayment | $ 500 | $ 500 |
| (m) Oriental rug | $ 2,500 | $ 1,100 |

| | Highest value | Lowest value |
|---|---|---|
| (n) Household furniture | $ 4,220 | $ 4,220 |
| (o) ½ interest in a boat | $ 3,600 | $ 3,600 |
| (p) 1987 Bronco automobile | $ 7,000 | $ 7,000 |
| (q) Hospital investment | $ 5,250 | $ 5,250 |
| (r) First & St. Clair property | $ 4,500 | $ 4,500 |
| (s) Certificate of deposit— Jack Scoville, Ltd. | $ 17,083 | $ 4,009 |
| Subtotal: | $1,030,486 | $831,012 |
| Less Jack's Marital Debt: | $466,945 | $466,945 |
| Net Award: | $563,541 | $364,067 |

| Linda's Marital Assets | Highest value | Lowest value |
|---|---|---|
| (a) Keough at Mark Twain | $ 1,195 | $ 1,195 |
| (b) IRA in wife's name | $ 34,763 | $ 34,763 |
| (c) Cash value—life insurance | $ 10,099 | $ 10,099 |
| (d) Cash value—life insurance | $ 4,999 | $ 4,999 |
| (e) Hunter garage property | $ 14,570 | $ 14,570 |
| (f) 1984 station wagon | $ 2,000 | $ 2,000 |
| (g) Marital residence | $150,000 | $120,000 |
| (h) Household furnishings | $ 3,699 | $ 3,699 |
| (h) ½ of 1986 tax refund | $ 5,857 | $ 5,857 |
| (i) ½ of 1989 tax refund— Jack Scoville, Ltd. | $ 500 | $ 500 |
| (j) ½ of Magna Group stock | $ 15,592 | $ 15,592 |
| (k) ½ of Mark Twain stock | $ 12,675 | $ 12,675 |
| (l) Real estate account— First Illinois Bank | $ 509 | $ 509 |
| (m) Oil painting | $ 500 | $ 500 |
| Subtotal: | $ 256,958 | $ 226,958 |
| Less Linda's Marital Debt: | $ 1,967 | $ 1,967 |
| Net Award: | $ 254,991 | $ 224,991 |

If we assign the lowest values to the marital assets ($364,067 and $224,991), Jack's award is 62% of the estate while Linda's award is

38%, a 24% differential. If we were to apply the highest values ($563,541 and $254,991) to the assets, the distribution to Jack and Linda is 69% and 31% respectively, a 38% differential. Assuming, *arguendo*, that the trial court accepted the figures most advantageous to the husband, *i.e.*, the lowest values to Jack's assets and the highest values to Linda's assets ($364,067 and $254,991), the distribution is 59% to Jack and 41% to Linda, an 18% differential.

■ The touchstone of proper apportionment is whether it is equitable in nature, with each case resting upon its own facts. (*In re Marriage of Cecil* (1990), 202 Ill. App. 3d 783, 790, 560 N.E.2d 374, 378.) While the value of the property is but one element to consider in ascertaining an equitable distribution, that element considered with other relevant factors demonstrates that the trial court's decision in this case was an abuse of discretion. Under section 503(d) of the Act, a court may also consider the following factors when apportioning property: each spouse's contribution to or dissipation of the marital property; the duration of the marriage; the relative economic circumstances of the parties; the age, health, station, occupation, amount and sources of income, vocational-skills, employability, estate, liabilities, and needs of each of the parties; the custodial provisions for any children; whether the apportionment is in lieu of or in addition to maintenance; and the opportunity of each spouse for acquisition of capital assets and income, and the tax consequences of the property division upon the respective economic circumstances of the parties. Ill. Rev. Stat. 1991, ch. 40, par. 503(d).

■ This marriage was 22 years old at the time of its dissolution. Although the husband was the primary breadwinner, a spouse's greater financial contributions do not necessarily entitle him or her to a greater share of the marital assets. (*In re Marriage of Rapacz* (1985), 135 Ill. App. 3d 1045, 1049, 482 N.E.2d 441, 444.) The spouse's contributions as a homemaker should be considered. In a long-term marriage, the source of the assets in acquiring marital property becomes less of a factor, and a spouse's role as the homemaker becomes greater. (*In re Marriage of Cecil* (1990), 202 Ill. App. 3d 783, 560 N.E.2d 374.) In this case the wife contributed substantial services as a homemaker over the duration of the 22-year marriage.

Although Linda worked outside of the home during the early years of the marriage, after their daughter was born they agreed that Linda should adopt the role of a traditional housewife and mother. Linda's skills outside this role are minimal, and she has entered school in order to improve her chances at employment. While Jack testified that the income from his investments is waning, Jack did ac-

knowledge that the decline in income from the Columbia Popeye's could be due to the present economy and that the Fairview Heights Popeye's was sustaining its income. Jack testified that Stages' income has decreased due in part to greater competition in the business. Recent remodeling of the operation will, hopefully, attract customers and, hence, increase income.

None of the assets awarded to Linda, with the exception of accounts earning interest, are income producing on their own. Linda argues that she stands to suffer significant tax consequences if she attempts to convert the property awarded to her into income-producing property. Jack concedes in his brief that invasion of the Keough and the IRA would result in tax penalties. Unlike Jack, Linda has minimal nonmarital assets. While Jack testified that his mother receives all the income from the Pike County real estate, he does hold an interest in the property. At one time he estimated the total value of the Pike County property at $3 million.

Regarding the physical health of the parties, Linda testified that she recently experienced a bad pap smear and has had inpatient procedures performed at her doctor's office. No testimony was presented to indicate that Jack has any physical or emotional condition which would impair his income-producing ability.

■■ While the trial court did not state the relevant factors it considered in making the distribution of assets, the record does reflect the value of the parties' resources, the age of the parties and their health, the duration of the marriage, petitioner's homemaking contributions, the disparity of the parties' earning potential subsequent to the dissolution, and the custodial award of the minor child to petitioner. After reviewing the record and the factors in section 503(d) to be considered in the division of marital property, we conclude the apportionment of marital property made by the trial court in this case was an abuse of discretion. On remand, we direct the court to increase petitioner's awarded share of marital property to a just proportion of the estate.

Linda Scoville next contends that the trial court erred in setting the maintenance award at $450 per month payable for the next four years.

■■ "A court may award maintenance only if a spouse: (1) lacks sufficient property, including marital property apportioned to [her], to provide for [her] reasonable needs, and (2) is unable to support [herself] through appropriate employment ***, or (3) is otherwise without sufficient income." (*In re Marriage of Schuster* (1992), 224 Ill. App. 3d 958, 970, 586 N.E.2d 1345, 1354; Ill. Rev. Stat. 1991, ch. 40, par.

504(a).) The court in this case made no express findings of fact in awarding maintenance. We have already determined that the property distribution in this case was inequitable and that the trial court must reapportion the marital assets. Because the issue of maintenance is related to and dependent upon the distribution of marital property, we believe it inappropriate to review this issue. The issue of maintenance should be considered by the trial court in view of the reconsideration required by this opinion.

Other assignments of error have been urged regarding attorney fees and child support which Jack was ordered to pay. Since these issues are related to and dependent upon the distribution of marital property, we believe it is inappropriate to review these issues in this appeal and express no opinion as to the merit of these issues. They should be considered by the trial court in view of the reconsideration required by this opinion.

Accordingly, the judgment of the circuit court of St. Clair County is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

W. LEWIS and H. LEWIS, JJ., concur.