FOURTH DIVISION
November 26, 2008

No. 1-07-1799

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| MAYA POLSKY, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee and Cross-Appellant, | ) | |
| | ) | No. 03 D 2662 |
| and | ) | |
| | ) | |
| MICHAEL POLSKY, | ) | Honorable |
| | ) | William S. Boyd, |
| Respondent-Appellant and Cross-Appellee, | ) | Judge Presiding. |

PRESIDING JUSTICE O'BRIEN delivered the opinion of the court:

Respondent, Michael Polsky, appeals the final judgment of dissolution awarding the petitioner, Maya Polsky, more than $183 million. Michael contends the trial court erred by: (1) awarding Maya $183 million out of a roughly $367 million estate, when nearly all of the wealth was acquired through Michael's efforts while both spouses were separately engaged in business pursuits outside the home; (2) requiring Michael to bear all the costs of liquidating the estate to generate cash for Maya; (3) awarding postjudgment interest in Maya's favor for the entire period of liquidation; (4) failing to award Michael one-half of a $649,767 tax refund received by Maya; (5) failing to consider certain liabilities of Michael's company, Invenergy, when dividing the marital estate; and (6) awarding retroactive interest from the date of the original judgment, October 2006, even on the portion of the award that was added on June 4, 2007, as a result of the motions to reconsider. We affirm the property distribution and the award of postjudgment interest pending satisfaction of the judgment. We reverse the order of retroactive interest on the portion of the June 4, 2007, award that was added as a result of the motions to reconsider.

No. 1-07-1799

Maya cross-appeals, contending the trial court erred in its amended judgment by failing to award her $18.8 million of the $38.6 million Invenergy had received as a result of a financing transaction. We affirm on the cross-appeal.

At trial, the evidence established that Maya first met Michael in February 1975 in Kiev. Maya had obtained a bachelor's degree in English as a second language from Teacher's College of Foreign Languages in Kiev and was teaching English courses at the Pordigorgical Institute. At the time, Maya intended to pursue a doctorate degree, and she was preparing for an examination that was required for entry into the doctorate program.

Michael was formally trained as an engineer, having earned a master's degree in mechanical engineering in Kiev in 1973. Michael decided to leave the Soviet Union because he was ambitious and saw no future for himself there. Michael intended to emigrate to Canada because he had a cousin there. Maya decided to forego her doctorate degree and instead emigrate with Michael.

On June 28, 1975, Maya and Michael were married in Kiev. Shortly after their marriage, they applied for permission to leave the country. In January 1976, they left the Soviet Union. They had only four or five duffel bags of clothes, $100, and some things that Maya's father gave them to sell for additional money.

To leave the Soviet Union, Maya and Michael embarked on a train from the town of Chop in the Western Ukraine. The train from Chop took them to Vienna, Austria. In Vienna, they were met by a Jewish organization that assisted individuals who were leaving the Soviet Union for Israel. However, since Maya and Michael intended to go to Canada rather than Israel,

they sought assistance from the Joint Distribution Committee in Vienna, a group that could assist them in getting to Canada. After staying in Vienna for one week, the Joint Distribution Committee sent them to Italy.

Upon arriving in Rome, Maya and Michael were provided temporary lodging by the Joint Distribution Committee. Thereafter, they found an apartment in Ostia Lido, Italy, which they shared with another family.

Maya and Michael remained in Ostia Lido for six months. While there, Maya was able to find employment with the Joint Distribution Committee doing translation work. Maya used all the money that she received from the Joint Distribution Committee for the needs of Michael and herself. Michael was unable to obtain employment in Ostia Lido. Instead, he tried to raise money by selling the few things they were able to bring from the Soviet Union. During the six months they lived in Ostia Lido, Maya and Michael survived primarily on the money Maya earned doing translations, as well as the money Michael was able to get from selling their things. During this six-month period in Ostia Lido, Maya became pregnant with their first child.

While living in Italy, Maya and Michael were informed that they were denied entry into Canada. As a result, they applied for entry into the United States instead. In June 1976, Maya and Michael gained entry into the United States as refugees from the Soviet Union. They had nothing with them except $500 and some clothing.

Maya and Michael initially settled in Detroit, Michigan, and found an apartment. While Michael looked for work, they received charity assistance from the Hebrew Immigrant Aid Society. As Michael testified at trial, he was told there were only four jobs available in Detroit,

and he was encouraged to take a job as a painter. Michael refused because he "was determined to be who [he] was which was an engineer, so [he] went to the library, research[ed] books every day, *** found companies in [his] field and *** sent over a period of probably a month, month and a half about 200 resumes." Eventually, Michael received two job offers, and he accepted a job as an engineer with Bechtel Corporation in Ann Arbor, Michigan.

The couple's first child, Alan, was born in November 1976, and shortly thereafter they moved to Ann Arbor to be nearer to Michael's job at the Bechtel Corporation. While living in Ann Arbor, Maya stayed home to care for Alan and the family home. Maya testified that she "learned how to cook, how to clean, how to do everything, and basically, [she] was taking care of the baby and Michael." Michael earned approximately $15,000 per year, and Maya described their lifestyle at that time as "modest." During this time, Maya and Michael began taking walks together, which Maya characterized as a "tradition" that lasted until their separation. On average, the walks would last an hour, during which time they talked about "kids, [her] work when [she] worked, his work, [their] friends, everything."

After living in Ann Arbor for approximately 1 ½ years, Maya and Michael moved to St. Cloud, Minnesota, where Michael took a job with Brown Bovery. Maya worked part-time as a Russian language teacher at St. Cloud State University for one semester. In May 1979, Maya gave birth to their second son, Gabriel. Maya and Michael purchased a house, and Maya served as homemaker and took care of Alan and Gabriel.

In 1980, when Alan was four years old and Gabriel was a newborn, Michael accepted a position with Fluor Daniel Corporation in Chicago to work in the area of cogeneration.

Cogeneration involves harnessing the thermal energy created when electrical energy is produced and then piping it to an industrial user, which uses that steam power to run industrial plants. This position returned Michael to his area of expertise and offered him more money than his previous employment.

After renting a townhouse for six months, Maya and Michael purchased a home in Glencoe. While Michael worked at Fluor Daniel Corporation, Maya tended to the household chores and took care of the children. Maya testified that she "did everything. The boys [became] involved in [sports] a lot and all of these children's activities. *** Alan actually was playing hockey at that time. So it [was] just all the chores, you know, again, keeping the house, cleaning the house, doing the laundry, cooking. *** Driving the boys, you know, to play [with other] kids, having kids over at the house, what mothers do."

Maya also took some courses and worked in real estate for approximately one year. Also, when Gabe was four years old and attending school, Maya worked for a short time as a make-up artist at Saks Fifth Avenue. However, Gabe began having difficulties at school. Maya quit her job to stay home and take care of the family.

By 1985, Michael decided that he wanted to pursue his own business. Maya supported Michael's decision. While Maya took care of the children and the couple's home, Michael explored opportunities and eventually decided to co-found Indeck Energy Services with Gerald Forsythe. Indeck was a company that specialized in cogeneration projects.

Cogeneration requires both a purchaser of thermal energy (a steam host) and an outlet for the electrical energy (accomplished through a power purchase agreement.) One of Michael's

central roles in Indeck was to find steam hosts. Michael testified that he "had to find the steam host, [he had] to be able to negotiate with them a deal for the land, [he] had to negotiate with [them] a deal for sale of materials, [he] had to find purchase of electricity." Michael explained he had to find a company that would "build a plant, negotiate construction [contract]" and he had to "file, apply for all the permits necessary to build a plant. [He had] to find the money to finance the plant *** and then [he and Forsythe had] to operate and maintain the plant. So the development process is *** an involved process."

Michael cited the example of the Yerkes power plant:

"I met a person from DuPont at a conference and he said that they are thinking about building cogeneration plant, but they were already in the process of agreeing with somebody and I said listen, just trust me, we can do it for you, give me an opportunity to come and present to you and explain why we can do for you and then you make your choice. He kind of resisted and he said ok, so then they invited me to DuPont headquarters in Wilmington, Delaware. There were about 10 people from DuPont, purchasing guy, engineering guy and the plant guy and the facilities and corporate management guy, every discipline, and I was by myself, and they were discussing with me and I was able to handle most of the areas of the discussion and I could not believe that at the end they call me and say listen, we're impressed, we trust you, you can do it. They gave me the project."

During this time, Michael also decided to pursue an MBA degree from the University of Chicago. Initially, Maya was against the idea because it meant that Michael would be home even

less than he was as a result of starting Indeck. Nonetheless, Michael went ahead anyway and ultimately earned the degree.

In 1990, when Alan was 13 years old and Gabe was 10 years old, Maya decided to open an art gallery. With funds saved from Michael's earnings, she opened the Maya Polsky Gallery. Michael has described the gallery as a break-even proposition. Family funds were used to subsidize the gallery for the first five or six years of its existence. Michael also assisted by negotiating the initial lease of gallery space.

Maya testified:

"At the point when I opened the gallery, we were able to have a housekeeper. *** It wasn't a big expense because these women were not very expensive, but they took care of the house, cleaning and laundry and cooking most of the time, but I did the rest of the things. I sort of oversaw the house, went grocery shopping, everything for the boys, driving the boys, and when there were other things [that] needed to be done."

Meanwhile, around the fall of 1990, Michael and Mr. Forsythe had a falling-out, and Mr. Forsythe terminated Michael. With Maya's support, Michael pursued legal action against Mr. Forsythe and Indeck. Michael's litigation was successful, and he received two payments as a result: approximately $5 million in 1992 and $20 million in 1994.

In 1994, Alan went off to college and Gabe went to prep school in Connecticut, followed later by college.

Michael started a new company, SkyGen. For a few months, Michael funded SkyGen's operations with family savings, but he later brought in Allstate Insurance to fund the company,

followed by capital infusions from two energy companies in 1993 and 1997. The SkyGen venture proved extremely successful.

Michael formed SkyGen to develop, own and operate electric generating facilities, primarily in cogeneration and peak-power generation, and it developed approximately 15 power plant projects. Michael testified that creating and building SkyGen was tremendously stressful for him and required "a lot of concentration" as he "put all [his] energy, all [his] skills, all [his] talents and all [his] time into that."

Maya was not involved in the operations of SkyGen, as she continued to focus on caring for the couple's children and operating the art gallery. However, she and Michael continued their tradition of taking walks together, during which they would discuss family and business issues. Maya testified that these walks were necessary because things were difficult as "it was a constant struggle and constant shortage of money and constant search for financing and [buy] and sell, and it was very, very, very hard."

In 2000, Michael negotiated the sale of SkyGen to the Calpine company for approximately $425 million, of which $220 million was in cash, with the remainder in restricted stock.

The parties separated for two months in 2001. After the separation ended, Michael spoke of an interest in forming another company, Invenergy. At first, Maya opposed the new venture, though she testified at trial: "he said he needed to be doing this, you know, it was important to him. He needed to be in action. He wanted to make deals. He started thinking about taking some of [the] people he used to work with *** to do something together, and so that was the

beginning of the process for him to–and he already had the office at Sears Tower, and he took more space there to accommodate offices for them, and that's how it started."

Although the sale of SkyGen included a restriction on Michael's ability to participate in the industry, Michael negotiated an early termination of that restrictive covenant, and then he formed Invenergy. Invenergy began active operations in March 2003. In the meantime, Maya and Michael separated for the second and final time in September 2002, and Maya filed her action for dissolution of marriage on March 13, 2003, just as Invenergy was getting started.

Michael invested approximately $73 million in marital funds in Invenergy since its inception. When asked why he thought it appropriate to invest marital funds into Invenergy, Michael testified "because [he's] been twice very successful starting businesses from scratch and *** [he] had the capacity, ability, talent, skills, *** health and ability to move on and continue to do what *** [he] was good at."

Invenergy has succeeded financially. At trial, the court valued the marital interest in the company at approximately $75 million.

On October 3, 2006, the trial court entered its judgment for dissolution of marriage. The trial court determined the value of the marital estate to be $339,645,805 and that each spouse should receive an equal share of the marital estate. In so finding, the court stated:

"The Court has reviewed the mandates of 750 ILCS 5/503. It has also reviewed case law in regards to the issue of distribution. The Court is also mindful of the concept that an equitable division of marital property is not necessarily an equal division. Again after reviewing the testimony, arguments of counsel, appropriate statutes and case law, the

Court finds that it is only equitable that the parties share in the marital estate equally."

Following the trial court's entry of the judgment, Michael moved for reconsideration. Michael asserted the trial court erred in awarding Maya an equal share of the marital estate. Maya also moved for reconsideration based primarily on various alleged mathematical errors in the judgment.

On June 4, 2007, the trial court entered an amended judgment of dissolution, the effect of which, according to Michael, was to increase the size of the marital estate and to increase Michael's judgment obligations to Maya. The trial court denied Michael's motion to reconsider the equal division of the marital estate. In so denying Michael's motion, the trial court stated: "Michael does not present this Court with any new information or that the Court ha[d] erred or misapplied any applicable law in its determination of the equitable division of the marital assets."

I. Michael's Appeal

On appeal, Michael contends the trial court erred by awarding Maya an equal share of the marital estate, roughly $183 million, following the parties' 30-year marriage.

Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (hereinafter, the Act) provides the trial court:

"[S]hall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:

(1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the dissipation by each party of the marital or non-marital property;

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any antenuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d) (West 2002).

Michael contends the trial court's 50/50 division of the marital property must have resulted from an incorrect interpretation and application of the statutory factors under section 503(d), and the 50/50 division therefore reflected an error of law that is reviewable de novo. Michael's contention is without merit, where the trial court expressly stated that it had "reviewed

the mandates" of section 503, and where the record contains no indication the trial court ignored, misinterpreted, or misapplied any of the statutory factors set forth therein. Contrary to Michael's contention that the de novo standard of review applies, it is well established that decisions concerning the distribution of marital property lie within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. See In re Marriage of Parker, 252 Ill. App. 3d 1015, 1018 (1993). An abuse of discretion is found only when no reasonable person would take the view adopted by the trial court. Parker, 252 Ill. App. 3d at 1018-19.

Michael contends the court's 50/50 split of the marital property, in which Maya was awarded approximately $183 million, constituted an abuse of discretion because the court's award ignored the "overwhelmingly disproportionate" contribution Michael made to the value of the estate. Michael contends the massive marital estate exists solely because of his efforts in acquiring three companies: Indeck (for which he received approximately $25 million after suing to enforce his rights in the company); SkyGen (which he sold in 2000 for approximately $425 million in cash and stock); and Invenergy (a venture that Michael started after the parties' final separation in which the marital interest was valued at approximately $75 million). Michael argues that Maya was never employed by Indeck, SkyGen or Invenergy, that she never worked to advance their goals, and the "explosion of wealth set off by Michael occurred during a period of time when Maya was pursuing her own business interests [i.e., her art gallery] outside the home."

Michael further argues:

"[t]he size of the marital estate necessarily affects the weight to be given to the statutory criteria, especially when, as here, the size is both extraordinary and the direct result of one spouse's extraordinary contributions. In another case, if there were minimal property and the court had to be concerned with providing for the basic needs of a dependent spouse with custody of minor children, the financial contributions of the parties might not be the most important factor, and the court might be more likely to award a greater portion of the property to the spouse with the greater need. On the other hand, when there is a very large marital estate, as here--more than enough to provide for each party's reasonable needs and future financial security--it only makes sense to give more weight to the parties' contributions, because the other factors will be neutral."

Michael contends that "if the marital estate is like the one now before the Court--enough to provide each party with much more money than can reasonably be spent in a lifetime, so that the court's task is to divide a huge 'surplus'--the General Assembly's expression of public policy directs that the party responsible for creating that surplus receive the lion's share of it."

Michael's contentions are without merit. The Act's objective is to recognize and compensate each party for his or her contributions to the marriage and to place each party in a position to begin anew. Parker, 252 Ill. App. 3d at 1018. Pursuant thereto, the Act provides that marital property is to be divided in "just proportions" considering all relevant factors, including "the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including the contribution of a spouse as a homemaker or to the family unit." 750 ILCS 5/503(d)(1) (West 2002). The "duration of the marriage" also is to be

considered (750 ILCS 5/503(d)(4) (West 2002)) , as well as some 10 other factors, including the relevant economic circumstances of each spouse when the division of property becomes effective (750 ILCS 5/503(d)(5) (West 2002)), and the reasonable opportunity of each spouse for future acquisition of capital assets and income (750 ILCS 5/503(d)(11) (West 2002)). (See also our discussion above.)

Thus, under section 503(d), a spouse's financial contribution to the acquisition of marital property is only one of several factors the trial court considers when fashioning an equitable distribution of marital assets. In re Marriage of Johns, 311 Ill. App. 3d 699, 704 (2000). In In re Marriage of Heroy, No. 1-07-0308, slip op. at 32 (September 17, 2008), this court recently has held that "[a]lthough a party's greater financial contribution may support a disproportionate property award in favor of the contributing spouse (see, e.g., In re Marriage of Jones, 187 Ill. App. 3d 206 (1989); In re Marriage of Guntren, 141 Ill. App. 3d 1 (1986)), 'a spouse's greater financial contributions do not necessarily entitle him or her to a greater share of the marital assets' (In re Marriage of Scoville, 233 Ill. App. 3d 746, 758 (1992)). Indeed, '[i]n a long-term marriage, the source of the assets in acquiring marital property becomes less of a factor, and a spouse's role as homemaker becomes greater.' Scoville, 233 Ill. App. 3d at 758." Each case rests on its own facts. In re Marriage of Cecil, 202 Ill. App. 3d 783, 790 (1990).

In the present case, during the course of the parties' 30-year marriage, Maya emigrated from Kiev with Michael; she helped support Michael in Italy by doing translations; she gave birth to their first child in Michigan and cooked, cleaned, took care of the baby and did "everything" while Michael worked at the Bechtel Corporation; she gave birth to their second child in

Minnesota and continued to serve as homemaker and care for the children while Michael now worked for Brown Bovery; she continued to tend the household and take care of the children in Glencoe after Michael took a job with the Fluor Daniel Corporation in Chicago in 1980; she encouraged Michael to go into business with Gerald Forsythe and start Indeck Energy Services in 1985; after Michael's termination from Indeck, she encouraged him to pursue litigation, which eventually resulted in a $5 million payment in 1992 and a $20 million payment in 1994; she cared for the children and operated an art gallery after Michael started SkyGen, which he initially funded with family savings and later sold for approximately $425 million; and Michael later started Invenergy, into which he invested $73 million in marital funds.

These facts indicate that Maya was the homemaker and primary caregiver for the couple's two children during the course of their 30-year marriage, all of which enabled Michael to move from job to job and city to city, earn an MBA degree, start up three different companies, and earn vast amounts of money.   This case is similar to In re Marriage of Stralow, 95 Ill. App. 3d 235 (1981), and Heroy.  In Stralow, Harold and Dorothy Stralow were married in Iowa in 1937. Stralow, 95 Ill. App. 3d at 235.   Upon the marriage, Harold began working as a tenant farmer. Stralow, 95 Ill. App. 3d at 235. The couple eventually bought a 320-acre farm near Coleta, Illinois.  Stralow, 95 Ill. App. 3d at 235-36.  Harold sold 40 acres and farmed the rest of the land. Stralow, 95 Ill. App. 3d at 236.  Eight years later, the couple bought a 255-acre farm in the same vicinity.  Stralow, 95 Ill. App. 3d at 236.  They sold 175 acres and "the remaining land [was] put into production."  Stralow, 95 Ill. App. 3d at 236.  In 1969, Harold quit active farming and went to work for the Illinois Highway Department. Stralow, 95 Ill. App. 3d at 236.  Meanwhile,

during the course of the marriage, Dorothy "did those tasks expected of an Illinois farm wife," including raising the children, and doing the cooking, laundry, and housework. Stralow, 95 Ill. App. 3d at 236.

The marriage was dissolved in 1979. Stralow, 95 Ill. App. 3d at 236. The estate consisted primarily of the family farms and was valued at over $1 million. Stralow, 95 Ill. App. 3d at 236. The trial court divided the marital estate about equally between the parties. Stralow, 95 Ill. App. 3d at 236. On appeal, Harold contended that the apportionment of the marital estate was inequitable as it failed to properly take into account that he had contributed, by his labor, all the capital to the farm. Stralow, 95 Ill. App. 3d at 237. In affirming the property distribution, the appellate court noted the trial court had credited Harold's financial contributions and management capabilities. Stralow, 95 Ill. App. 3d at 237. The appellate court also noted that "[a]lthough different in kind, the wife's services were not of less significance than her former husband's contributions." Stralow, 95 Ill. App. 3d at 237. The appellate court held that "[t]he fact one party's contribution to the estate can be readily quantified in dollars in no way maximizes that party's interest over another's." Stralow, 95 Ill. App. 3d at 238.

In Heroy, the husband, David Heroy, and the wife, Donna Heroy, were both attorneys at the time they married. Heroy, slip op. at 2. David practiced in the area of bankruptcy law, while Donna worked as a law librarian. Heroy, slip op. at 2, 4. The couple married in 1980 and had their first child in 1983. Heroy, slip op. at 2-3. Following the birth of their first child, Donna returned to work full-time as a law librarian. Heroy, slip op. at 3. Donna gave birth to their second child in 1985. Heroy, slip op. at 3. Donna returned to work part-time until 1987. Heroy,

-16-

slip op. at 3. Donna resigned in 1987 and never again resumed full-time employment outside the home. Heroy, slip op. at 3-4. Instead, she devoted approximately 10 hours per week to a publishing company she had started, earning $5,000 annually. Heroy, slip op. at 4. Donna gave birth to the couple's third child in 1990. Heroy, slip op. at 4.

Over the course of the marriage, David was the family's primary source of income. Heroy, slip op. at 4. He began his legal career at Gardner, Carton and Douglas in 1976 and his salary eventually rose to approximately $240,000 per year. Heroy, slip op. at 4. In 1989, David began employment at Neal, Gerber and Eisenberg, became the chairperson of the bankruptcy department, and earned approximately $350,000 to $475,000 annually. Heroy, slip op. at 4. In 1997, David transferred to Bell, Boyd & Lloyd, where he became the chairperson of the firm's bankruptcy department and a corporate partner. Heroy, slip op. at 4. In 2000, David became an equity partner at the firm and a member of the firm's executive committee. Heroy, slip op. at 4. In addition to his law firm income, David also received substantial stock and real estate rental income from a company started by his parents. Heroy, slip op. at 4.

Throughout the marriage, the couple employed domestic help. From 1984 through the time Donna filed for divorce in 2003, the couple employed a full-time person to assist Donna in caring for the children. Heroy, slip op. at 8. The couple also employed a cleaning lady who worked two days per week, a laundress who worked one day per week, and various private chefs. Heroy, slip op. at 8.

In 2003, Donna filed a petition for dissolution of marriage. Heroy, slip op. at 2. David filed a counterpetition for dissolution of marriage. Heroy, slip op. at 2. After a hearing, the trial

court valued the marital estate at $8.7 million and awarded 55% of the marital estate to Donna. Heroy, slip op. at 13, 14. The court awarded 45% of the marital estate to David. Heroy, slip op. at 14.

On appeal, David argued the trial court failed to properly consider the parties' relative contributions to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property as required by section 503(d)(1) of the Act. Heroy, slip op. at 31. David noted that he had earned 99% of the family's income since 1987, that he had contributed $11.9 million from his nonmarital estate, and that his "extraordinary efforts" resulted in the sale of the marital home at a price more than $1 million higher than prior sale offers. Heroy, slip op. at 31. David contended Donna's marital contributions were not "extraordinary" and the trial court abused its discretion in awarding Donna 55% of the marital property. Heroy, slip op. at 31.

The appellate court affirmed the property distribution, stating:

"[W]hile David's financial contribution weighs strongly in his favor, other factors favor Donna. As the trial court observed, Donna meaningfully contributed to the family unit during the Heroys' 26-year marriage. She devoted the majority of her time to raising their three children and played an integral part in their educational and social lives. She also contributed meaningfully as David's spouse by managing the household and entertaining his business associates. At the time of the hearing, Donna was 56 years old and had not worked full-time outside of the house for approximately 20 years. The trial court's order reflects that it carefully considered the factors outlined in section 503 of the Act, including the contribution of the parties, in setting the property distribution award.

Accordingly, although David was the primary economic provider during the duration of their marriage, we cannot conclude that the trial court's order awarding Donna 55% of the marital estate constitutes an abuse of discretion." Heroy, slip op. at 32-33.

In the present case, as in Stralow and Heroy, the trial court properly could find that Maya's contributions as homemaker and primary care giver for the couple's children during the course of their 30-year marriage were of no less significance than Michael's financial contributions; that Maya meaningfully contributed to the family unit by raising their two children, playing an integral part in their educational and social lives, and by managing the household; and that Maya thereby enabled Michael to study, travel, and work at growing the three businesses that provided the bulk of the marital estate. As such, we cannot say the trial court abused its discretion in dividing the estate 50/50, such that no reasonable person would take the view adopted by the trial court. Parker, 252 Ill. App. 3d at 1018-19. Accordingly, we affirm the property distribution.

Michael contends, though, that "there is no dispute that the overwhelming portion of the marital estate was developed at a time when the children were grown and Maya was no longer working as a homemaker--instead, she was pursuing her own business outside the home. Again, by the time Michael received the $25 million Indeck settlement and had started SkyGen--which produced most of the wealth in the estate--Maya had been working outside the home for several years, the family had already retained full-time housekeepers, and the couple's two sons were both away at school." Accordingly, Michael argues that "[n]o matter how generously one could describe Maya's homemaker contributions, they do not remotely come close to the significance of

Michael's financial contributions when viewed in the context of the value of the marital estate."

As discussed above, though, the standard of review here is extremely deferential; the appellate court's property distribution will not be reversed absent an abuse of discretion such that no reasonable person would have taken the view adopted by the trial court. See Parker, 252 Ill. App. 3d at 1018-19. The trial court reasonably could have concluded here that Maya's contributions as homemaker and primary caregiver from 1975 (when the couple was married) to 1990 (when Maya began working at the art gallery) set the foundation for Michael's subsequent business achievements. Moreover, Maya testified that even after she began working at the art gallery and hired housekeepers, she continued to oversee the house, shop for groceries, and do "everything for the boys." Thus, even after the opening of her art gallery, Maya continued to provide important nonfinancial contributions to the marriage and to Michael's business pursuits. And, the trial court reasonably could find that Michael used marital assets obtained in the early years of the couple's marriage to start SkyGen and finance Invenergy, and that Michael would not have had the assets for either venture without Maya's significant nonfinancial contribution to Michael's career.

Michael contends the trial court did not consider any evidence of Maya's needs for the future, that Maya did not prove that she needed 50% of the marital estate, and that Maya could make do with much less. However, the relevant inquiry is whether the trial court abused its discretion in making the award. For all the reasons discussed above, the trial court committed no abuse of discretion in the instant case.

Next, Michael contends the trial court erred by requiring him to bear the costs of

liquidating a portion of the marital estate to satisfy the judgment. Michael claims these liquidation-related costs include income taxes that will become due on realized gains upon sale of certain assets, as well as transaction fees associated with the sale of assets. Michael contends the costs associated with this liquidation will be just over $4 million, and the court should have required Maya to bear the costs of liquidation.

Michael first raised this issue in his posttrial motion for reconsideration. In denying Michael's motion, the trial court stated that it was allowing Michael to pay Maya over time, thereby allowing Michael to liquidate assets "in a deliberate and orderly fashion so as not to disrupt and/or impair his business." The court also recognized that Michael was a "unique businessman who, given the challenge, more than rises to the occasion"; in effect, the court was stating that it had given Michael enough leeway to keep the costs of liquidation relatively low. We find no abuse of discretion in the court's order.

Next, Michael contends the trial court erred by charging him postjudgment interest at 9% pending satisfaction of the judgment. Section 2-1303 of the Code of Civil Procedure provides that "[j]udgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied." 735 ILCS 5/2-1303 (West 2002). Interest on dissolution judgments is within the discretion of the trial court. In re Marriage of Kaufman, 299 Ill. App. 3d 508, 511 (1998).

As noted by Maya in her appellate brief, courts allow interest to encourage a judgment debtor to pay the judgment without undue delay. In the present case, Michael retained the assets that he was to liquidate to pay the judgment, as well as any increase in value those assets realized

prior to liquidation. The trial court's amended judgment gave Michael the time necessary to liquidate his assets in a deliberate fashion so that his businesses could continue to efficiently function. The court noted that it "essentially has allowed Michael to do that which he is best suited for, to make the business decision as to what, when and how assets are to be used o[r] liquidated to satisfy the award to Maya." The trial court tempered this benefit to Michael by allowing a reasonable rate of interest to be paid to Maya while Michael took the time to liquidate assets and pay the award. We find no abuse of discretion.

Next, Michael contends the trial court erred by failing to award him one-half of a $649,767 income tax refund that Maya received and allegedly spent after March 31, 2006. Michael claims that Maya successfully argued the income tax refund of $649,767 should not be added back to the marital estate. Michael contends the trial court's failure to award him one-half of that income tax refund was inconsistent with its order regarding a separate $814, 004 in refunds that the court credited to the marital estate and ordered to be divided between the parties. Michael states the "difference between the two refunds was that [the $649, 767] refund went into an account that Maya used for her discretionary spending, while the other [$814, 004] went into a different account, but both parties were able to identify the amounts of the refunds and to confirm the refunds had been received by the marital estate. The refunds should have been treated the same, and the failure of the trial court to do so had the effect of tilting the distribution of [the] marital estate from the purported 50/50 split into a split that favored Maya over Michael."

Although Michael contends the $649,767 income tax refund went into an account that Maya used for her discretionary spending and should be added back to the marital estate, he has

failed to provide any record citation thereto. Our review of the 22-volume record has uncovered a pleading from Maya in which she states that Michael's "contention that the [$649,767] refund was 'received and used exclusively by Maya' is deceptive and disingenuous. It appears from discussions with the parties' tax counsel, Fullbright & Jaworski, that Michael's personal accountant, Jon Taiber, had indicated to Fullbright & Jaworski that the parties received a refund check made payable to Michael and Maya, and the refund check was deposited into a joint checking account." This pleading appears to contradict Michael's contention that Maya had sole use of the $649,767 via an account she used for her discretionary spending, a contention that Michael has not supported with a citation to the record. Michael also has failed to cite to the portion of the 22-volume record in which the parties made their respective arguments as to whether the $649,767 income tax refund should be added back to the marital estate. The failure to provide relevant citations to the record is a violation of Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)) and results in waiver. See Gomez v. The Finishing Co., 369 Ill. App. 3d 711, 723 (2006).

Next, Michael contends the trial court erred by failing to deduct from the marital estate certain liabilities payable to Invenergy employees under the so-called "Invenergy Phantom Rights Plan." The Invenergy Phantom Rights Plan provides, upon the liquidation of Invenergy, and after Michael receives back his capital contribution in Invenergy, that certain employees would receive compensation calculated as a percentage of Invenergy's value. Michael's counsel conceded to the trial court that if the marital interest in Invenergy was $75 million, then "there are no [phantom] rights implicated for the employees of Invenergy." The trial court specifically found the fair

market value of Invenergy was $75 million and the marital interest in Invenergy is $74, 250,000. As such, the trial court did not err in determining the employee's so-called phantom rights were not implicated.

Next, Michael contends the trial court erred by awarding retroactive interest from the date of the original judgment, October 2006, even on the portion of the award that was added on June 4, 2007, as a result of the motions to reconsider. An award of interest on a money judgment requires the amount of money owed is certain, such that the judgment debtor can tender the amount of the judgment, thereby halting the accrual of interest. Kramer v. Mt. Carmel Shelter Care Facility, Inc., 322 Ill. App. 3d 389, 392-93 (2001). In the present case, it was not until June 4, 2007, when the trial court ruled on the motions to reconsider, that Michael knew for certain the exact amount of money owed as a result of said motions. Accordingly, interest thereon should run from June 4, 2007, and should not run retroactively from the October 2006 date of the original judgment. Therefore, we reverse the order of retroactive interest on the portion of the award that was added on June 4, 2007.

II. Maya's Cross-appeal

On cross-appeal, Maya contends the trial court erred in its amended judgment by failing to award her $18.8 million of the $38.6 million Invenergy had received as a result of a financing transaction. As discussed extensively above, the trial court's distribution of marital property will not be reversed absent an abuse of discretion, such that no reasonable person would take the view adopted by the trial court. Parker, 252 Ill. App. 3d at 1018-19. In the present case, the trial court awarded Maya approximately $183 million out of a roughly $367 million estate. The $183

million award constituted a just division of the marital property that adequately reflected the relevant statutory factors, including the relative contributions of each party to the acquisition, preservation, or increase in the value of the marital property and the duration of the marriage. We cannot say the trial court abused its discretion by failing to give Maya an additional $18.8 million on top of the $183 million already awarded to her. We affirm on Maya's cross-appeal.

For the foregoing reasons, on Michael's appeal, we affirm the property distribution and the award of postjudgment interest pending satisfaction of the judgment, and we reverse the order of retroactive interest on the portion of the June 4, 2007, award that was added as a result of the motions to reconsider. We affirm on Maya's cross-appeal.

Michael's appeal is affirmed in part and reversed in part; Maya's cross-appeal is affirmed.

Affirmed in part and reversed in part; cross-appeal is affirmed.

GALLAGHER and NEVILLE, JJ.'s concur.