2024 IL App (2d) 220423-U
No. 2-22-0423
Order filed February 15, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF LORI ROZDOLSKY, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 16-D-1724 |
| TERRY ROZDOLSKY, | ) ) ) | Honorable Janelle K. Christensen, |
| Respondent-Appellant. | ) | Judge, Presiding |

_____

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in (1) determining the value of the parties' marital business, (2) awarding the business warehouse to wife, (3) dividing the parties' marital estate, (4) awarding wife monthly maintenance for one year, (5) classifying a retirement account as marital property, and (6) requiring husband to contribute to wife's attorney and expert fees. The trial court did err in (1) revising its original buyout terms of the wife's interest in the business, (2) allocating to husband as an asset a 2019 marital tax refund that had been applied to the parties' 2020 marital tax liability, and (3) setting the value of an asset that was awarded to the husband.

¶ 2    The respondent, Terry Rozdolsky, appeals from the judgment of the circuit court of Lake County, dissolving his marriage with the petitioner, Lori Rozdolsky.  He raises nine different issues.  We affirm in part, vacate in part, and remand with directions.

¶ 3                                    I. BACKGROUND

¶ 4    A substantial amount of evidence was presented to the trial court in this contentious dissolution action. Accordingly, we initially set forth only information sufficient to frame the issues raised by the parties in their appeals. Additional relevant facts will be presented in the analysis of the issues to which they pertain.

¶ 5    The parties were married on November 19, 1994, and have three adult children.  Terry had significantly more assets than Lori before the marriage, including several pieces of real estate, boats, and other assets which were later used to enhance the parties' lifestyle.  At the time of the marriage, Terry was self-employed at his own business, Midwest Marketing Group.  Lori stopped working shortly after the marriage to raise the parties' children.

¶ 6    Terry has worked in the picture frame industry since 1980.  In 1997, Terry incorporated Harbortown, Industries, Inc. (Harbortown).  Harbortown was a product development company, and its services included the design, sourcing, pricing, and display of products.  Picture frames made up approximately 80% of Harbortown's products.  Harbortown's largest customers were Walmart, Target, and Michael's.  Harbortown's sales ranged from $94.3 million in 2012 to $71.2 million in 2020.

¶ 7    Harbortown's office and warehouse were located at 28477 Ballard Drive in Lake Forest (Ballard property).  The parties owned the building through a land trust and leased the building to Harbortown pursuant to a "triple net lease," meaning that all repairs, all utilities, all real estate

taxes, and other expenses associated with the operation of the building were Harbortown's responsibility.

¶ 8     The parties owned property in Lake Forest, Libertyville, Chicago, and Florida.  The primary residence in Lake Forest (Circle Lane home) was valued at $16.13 million.

¶ 9     Lori filed a petition for dissolution of marriage on September 20, 2016.  On May 2, 2022, the trial court entered a judgment of dissolution.  It entered a modified judgment on October 20, 2022.  In its modified judgment, the trial court determined that the marital estate was worth $84,584,310.  Harbortown was worth approximately half that amount at $42,447,096.  The trial court awarded each of the parties 50% of the marital estate.  Because the parties agreed that both Harbortown and the primary Lake Forest residence would be awarded to Terry, and because there were not sufficient other assets to award Lori 50% of the marital estate, the trial court ordered that Terry pay Lori half of the value of Harbortown in installments.  The first installment would be $5 million, due 30 days after entry of judgment.  Thereafter, Terry would make installments annually of $2 million on May 1 until the balance was paid in full.  In its original judgment, the trial court set the interest rate on the installment payments at 1%.  In its modified judgment, the trial court raised the interest rate to 9%.

¶ 10     The trial court determined that the Ballard property had a fair market value of $5.28 million and its fair market value annual rent was $489,842.  The trial court awarded this property to Lori, which made her the landlord of Harbortown.  In its modified judgment, the trial court clarified that Terry was to assign the existing triple net lease to Lori.  The trial court further stated that if Terry could not find the existing lease, then the parties were to negotiate the terms of a new lease as the trial court would not impose lease terms on the parties.

¶ 11    As to the Florida properties, the trial court found that they were two adjoining vacation residences that shared a common pool and amenities.  The trial court awarded one of the residences to Terry and the other to Lori.  The trial court ordered that both parties remain equally responsible for the care and maintenance of the common areas of the residences.  The trial court subsequently modified its judgment to award both properties to Lori.  The trial court explained that, due to the parties' acrimony, evident by such things as the parties' dispute over rent for the Ballard property, it was convinced that the parties could not share responsibility for the care and maintenance of their Florida residences without further conflict.

¶ 12    The trial court found that, based on the size of the marital estate, Lori would not normally be a candidate for maintenance.  Nonetheless, it awarded her maintenance of $45,000 a month for one year, subject to review, as it was concerned that it might take time for her to begin receiving income from the lease for the Ballard property.  The trial court stated that, although Lori was receiving the Ballard property with its fair market value rent of $40,820 a month, she would not actually receive that much due to her having to pay for taxes, repairs, and utilities for the property.

¶ 13    The trial court ordered that Terry contribute $1.1 million for Lori's attorney and expert fees because he had "complicated and increased the cost of [the] litigation through his refusal to turn over the corporate financial records of Harbortown."

¶ 14    Following the trial court's revised judgment of dissolution, Terry filed a timely notice of appeal.

¶ 15                                    II. ANALYSIS

¶ 16    On appeal, Terry argues that the trial court erred in: (1) determining the value of the parties' marital business, (2) setting the buyout terms of Lori's interest in the business, (3) awarding the business warehouse to Lori, (4) dividing the parties' marital estate, (5) awarding Lori $45,000 in

monthly maintenance for one year, (6) classifying one of his accounts as marital property, (7) requiring him to contribute to Lori's attorney and expert fees, (8) allocating to him as an asset a 2019 marital tax refund that had already been applied to the parties' 2020 marital tax liability, and (9) allocating to him an asset that had an incorrect and outdated amount. We will address each of these arguments in turn.

¶ 17                                    A. Valuation of Harbortown

¶ 18    Lori retained David Bart, the Senior Director of Forensic and Dispute Resolution Services for the Great Lakes Region of RSM US LLP to provide a business valuation of Harbortown. He testified that the value of Harbortown, as of December 31, 2020, was $60,671,940. Bart asserted that Harbortown would experience significant growth from 2021 through 2024. He believed that Harbortown's future economic outlook would follow broad industry outlooks predicted for the retail sector, wholesale sector and home furnishing and wholesaling industry. He did not believe that the frame industry was a mature industry which reached its peak almost a decade ago and was now shrinking.

¶ 19    Terry retained Lee Gould of Gould & Parker Associates, LLC, to provide a fair market value of Harbortown. Gould concluded that the value of Harbortown as of December 31, 2020, was $20,160,000. Gould explained that Harbortown's historic sales and profit margins were trending down and opined that the frame industry was mature. He determined that Harbortown's historic decline in revenue demonstrated that "it wasn't growly as robustly as the industry." He testified that, because Harbortown operated in a small, niche sector within the broader industry of home furnishing and wholesaling and this niche sector was facing unique headwinds, including its maturity, it would not grow alongside the broader industry trends.

¶ 20    The trial court rejected the majority of Gould's opinions, setting forth seven different reasons. Specifically, the trial court criticized Gould's (1) use of 2020, the year of the world-wide pandemic, as the single year for a capitalization of cash flow methodology and projection of that income into perpetuity; (2) chosen growth rate of 3% for the company, which was "nothing more than inflation;" (3) failure to normalize certain expenses which constituted millions of dollars; (4) use of the wrong risk code in valuing the business, an error that Gould acknowledged making; (5) use of an outdated and high ratio for determining the common stock equity risk premium; (6) use of a debt to equity ratio which was contrary to the sources cited in his own report listing the median debt-to-equity ratios for companies comparable to Harbortown; and (7) failure to articulate why he believed Terry's goodwill in Harbortown represented 30% of the value of the business.

¶ 21    As to Bart, the trial court found that his opinions on valuation were more credible and that his method of valuation was reasonable. The trial court explained that it could not accept his final opinion on valuation, however, because it believed that he failed to adequately consider certain factors. Specifically, the trial court (1) rejected Bart's determination that Harbortown was not a mature industry, (2) found that his normalization rates for percentage of growth and sales were too optimistic, (3) found that he should have treated $60,000 in credit card debt from 2020 as business debt rather than personal debt, and (4) criticized Bart's failure to consider Terry's personal goodwill in Harbortown.

¶ 22    After considering both the opinions of Gould and Bart, the trial court determined that the value of Harbortown was $49,044.000. The trial court found that Terry's personal goodwill in Harbortown was 15% of the value of the company, or $7,356,600. After deducting the value of

Terry's personal goodwill, the trial court found that the fair market value of Harbortown was $41,687,400.

¶ 23    Following a motion to reconsider and to clarify, the trial court reduced the value of Terry's personal goodwill to $6,596,904. That increased the value of Harbortown to $42,447,096.

¶ 24    On appeal, Terry argues that the trial court determination as to valuation was against the manifest weight of the evidence. He asserts that Bart made numerous errors that undermined all his opinions. He insists that Bart (1) wrongly determined that Harbortown was not operating in a mature industry; (2) that its future growth would be consistent with the broad industry categories of wholesale, retail, and home furnishing; (3) that his valuation normalization adjustments lacked the proper foundation; and (4) his capitalization rate lacked the proper foundation. As the trial court improperly relied on Bart's valuation analysis, Terry contends that we should reverse and remand with instructions that it adopt Gould's opinion of value.

¶ 25    The trial court's determination of the value of an asset in a dissolution of marriage case will not be disturbed unless that determination is against the manifest weight of the evidence. *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 203 (2005). A factual finding is not against the manifest weight of the evidence unless the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence. *In re Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 67. When the record in a dissolution proceeding contains conflicting evidence regarding the value of a spouse's professional corporation, for purposes of determining distribution of marital assets, the trial court's selection of a value somewhere between the opposing values in evidence is not considered arbitrary or against the manifest weight of the evidence, provided the conflicting values are based on evidence supported by proper foundation. *In re Marriage of Head*, 273 Ill. App. 3d 404, 410 (1995). So long as the trial court's valuation of marital assets is within the range

testified to by expert witnesses, it will not ordinarily be disturbed on appeal. *Blackstone v. Blackstone*, 288 Ill. App. 3d 905, 910 (1997).

¶ 26     Here, the trial court agreed with Terry's criticisms of Bart's opinions. The trial court rejected Bart's opinion that Harbortown was not a mature industry. The trial court determined that Bart should not have included other related industries in evaluating Harbortown's potential growth rate rather than the "primary niche of picture frames" that Harbortown operated in. By improperly lumping Harbortown in with non-picture frame businesses, the trial court found that Bart's "normalization rates for percentage of growth and percentage of sales were too optimistic." Further, we note that Terry's criticism of Bart's capitalization rate is based on Bart considering more than just the picture frame industry in determining Harbortown's value. Again, the trial court specifically articulated this issue when determining that Bart's value of Harbortown was excessive.

¶ 27     Taking into consideration its disagreements with Bart's opinions and methodology, the trial court ultimately determined that the marital portion of Harbortown was worth approximately $18.3 million less than Bart said it was—almost $42.4 million rather than $60.7 million. As such, it is apparent that the trial court shared many of Terry's concerns of Bart's valuation of Harbortown and lowered its value significantly.

¶ 28     Terry points to *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.*, 12 Ill. App. 3d 165, 179 (1973), as a basis to reject all of Bart's opinions. There, the court held that an expert's opinion is entitled to little weight where a factual basis is lacking. *Id*. But this is not the type of case where the expert's opinions were so disconnected from reality that they were entitled to minimal weight. Rather, we believe that this case falls well within the general rule that the admission of expert testimony as well as the qualification of the expert in the first instance is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion.

*First National Bank of Mount Prospect v. Village of Mount Prospect*, 197 Ill. App. 3d 855, 862-63 (1990). Judged by that standard, the trial court committed no reversible error in admitting and relying upon Bart's testimony. For this same reason, the trial court did not err in not placing more weight on Gould's valuation of Harbortown. Accordingly, we decline to disturb the trial court's valuation.

¶ 29                           B. Buyout Terms of Lori's Interest in Harbortown

¶ 30    In its original judgment, the trial court ordered Terry to pay Lori $5 million within 30 days of the entry of judgment. Thereafter, Terry was ordered to make annual installment payments of $2 million at 1% interest until the balance was paid in full. In setting the interest rate at 1%, the trial court explained:

> "The Court recognizes that it [is] in the best interest of both parties to keep Harbortown a successful and profitable business. For this reason, the Court attempted to keep the payments in an amount which Terry can reasonably pay. The Court likewise assigned a very low interest rate. The Court acknowledges that Lori will not receive her full share of her portion of Harbortown for a number of years and that she is losing the investment income she could earn if she had the full amount up front. For this reason, Lori asked the Court to assign 9% interest, however, the Court is concerned that if it assigns that interest rate, that it will make it difficult for Terry to satisfy his obligation. Frankly, neither party benefits if Harbortown fails. Recognizing that balancing the estate is just that—a balancing act—in assigning such a low interest rate, the Court weighed the fact that it allocated Lori a significantly greater share of the retirement accounts. Over time, Lori will enjoy a better return on her retirement accounts than will Terry."

If Terry was unable to timely make installment payments, the trial court ordered that he borrow against his equity in Harbortown or the other real estate and other assets that he had been awarded.

¶ 31   Lori filed a motion to reconsider, arguing that the trial court's ruling was inequitable because it forced her to loan Terry $19.6 million at a rate less than inflation. This would result in her actually receiving less than 50% of total value of the marital estate because Terry would be able to use her property to generate more than 1% by investing those assets instead of paying them to her.

¶ 32   Following a hearing, the trial court agreed with Lori's argument and awarded her interest at 9%. The trial court explained:

> "Here, the equitable considerations weigh in favor of imposing statutory interest under section 2-1303. Given the history of contentious legal proceedings in this case, the Court believes that the comparatively high interest rate in Section 2-1303 of the Code of Civil procedure is necessary to encourage Terry to pay Lori what she is owed without undue delay, and to minimize the financial risks of nonpayment to Lori over the course of a lengthy payment plan."

¶ 33   Terry argues that the trial court erred in granting Lori's motion to reconsider as to interest because Lori did not set forth a valid basis to disturb the original order. The purpose of a motion to reconsider "is to bring to the trial court's attention newly discovered evidence not available at the time of the first hearing, changes in the law, or errors in the previous application of existing law to the facts at hand." *In re Marriage of Heinrich*, 2014 IL App (2d) 121333, ¶ 55. Generally, a trial court's decision to grant or deny a motion to reconsider will not be reversed absent an abuse of discretion. *General Motors Acceptance Corp. v. Stoval*, 374 Ill. App. 3d 1064, 1078 (2007). In considering whether the trial court abused its discretion, we also consider whether substantial

justice is being done between the parties. *In re Marriage of Sutherland*, 251 Ill. App. 3d 411, 414 (1993). However, where the motion was based only on the trial court's application or purported misapplication of existing law, rather than on new facts or legal theories not presented at trial, a reviewing court reviews *de novo* the trial court's decision to grant or deny the motion. *Bank of America, N.A. v. Ebro Foods, Inc.*, 409 Ill. App. 3d 704, 709 (2011).

¶ 34 In her motion to reconsider, Lori did not point to any new evidence or law or assert that the trial court misapplied the law when it determined that Terry's installment payments would accrue at 1% interest. Thus, she has forfeited the argument that the trial court committed any error in this regard. See *Bank of New York Mellon v. Rogers*, 2016 IL App (2d) 150712, ¶ 72, (issues not raised in the trial court are forfeited and may not be raised for the first time on appeal).

¶ 35 Lori asserts that "substantial justice" was the basis for her motion to reconsider. However, "substantial justice" is intertwined with an abuse of discretion analysis. See *Babcock v. Wallace*, 2012 IL App (1st) 111090, ¶ 23 (reviewing courts will reverse a trial court for abuse of discretion, "subject only to an inquiry as to whether substantial justice is being done between the litigants"). We do not consider whether a trial court has abused its discretion until first considering whether the movant has met its "arduous burden" (*Jones v. Knockum*, 2013 IL App (1st) 122227-U, ¶ 19) of alerting the court to "newly discovered evidence, changes in law, or error in the court's application of previously existing law" (*Nissan Motor Acceptance Corp. v. Abbas Holding I, Inc.*, 2012 IL App (1st) 111296, ¶ 16). As Lori did not meet her burden on the issue of interest, the trial court erred in modifying its award of interest. We therefore vacate the trial court's decision and reinstate its original order of 1% interest.

¶ 36 In a related argument, Terry argues that the trial court erred in ordering that he "borrow against Harbortown" if he is unable to make the installment payments. His argument is premised

on the interest rate of 9% making it nearly impossible to make those payments. As we have determined that the trial court's original order of 1% interest should be reinstated, the underlying rationale for his argument is now moot.

¶ 37 Terry also argues that the trial court erred when it *sua sponte* added a new payment term to its revised judgment upon reconsideration, which stated:

"If Terry sells or transfers his interest in Harbortown, then the right to make installment payments shall cease and Terry shall immediately make Lori whole for the remaining portion of her allocated share of Harbortown (including any statutory interest owed) from the proceeds of the sale or transfer."

¶ 38 Terry argues that the trial court's order "is problematic and inequitable, as it predetermines what should happen at the time of an unknown future sale of Harbortown, when the court does not, and cannot, know what the circumstances will be at that time." He contends that it "is possible that the amount of net proceeds would equal the amount of balance, which would result in [him] automatically being forced to make Lori whole for her share of the court's value of Harbortown while leaving no other proceeds." He also argues that the trial court's order would require him to pay Lori the entire remaining portion of her allocated share of Harbortown, even if just sells or transfers a portion of his interest in Harbortown, which he insists would be inequitable.

¶ 39 Terry's concerns with the trial court's order arises from his request that he be awarded the parties' two largest marital assets—the Circle Lane home (valued at over $16 million) and Harbortown (valued at over $42 million), which accounts for almost 70% of the parties' marital assets. The trial court granted his request and determined that it wanted to divide the marital estate equally, which necessitated that Terry pay Lori in installments. Based on this arrangement, the Circle Lane home and Harbortown served as collateral for the money that Terry owed Lori. It was

not unreasonable for the trial court to order Terry to pay Lori the remaining balance on the installment payments if he sold the underlying collateral for those payments.

¶ 40                    C. Award of Ballard Warehouse to Lori

¶ 41    As previously mentioned, Harbortown's offices and warehouse are in an 85,000-square-foot facility located at 28477 North Ballard Drive in Lake Forest.  At trial, the parties stipulated that the Ballard property was worth $5.28 million.  In her closing argument, Lori asserted that the Ballard property should be awarded to Terry.  Nonetheless, in its judgment order, the trial court allocated the property to Lori, making her the landlord for Terry and his company.

¶ 42    In dividing the marital estate, the trial court made findings as to the parties' inability to cooperate.  In noting that the marital estate is large buts lacks liquidity, the trial court explained that "difficult[ies]" dividing the marital estate included the fact that Lori and Terry "cannot work together" and requiring them to work together would "create chaos and never ending litigation."  In its order on reconsideration, the trial court reiterated its findings that the parties cannot work together when it noted that it awarded Harbortown to Terry because requiring the parties to co-own that asset would "lead to further conflict and litigation."  That same order also reconsidered the trial court's original award of the two separate but "physically conjoined" Florida properties as one to each party, ordering instead that both go to Lori where "the parties cannot share responsibility for the care and maintenance of their Florida residences' common areas without further conflict" given "the parties' acrimony during the pendency of the case."

¶ 43    Terry argues that the trial court erred in awarding the Ballard property to Lori because of the parties' inability to work with each other.  He notes that immediately after entry of judgment, Lori requested that the trial court impose lease terms on him, including rent that he asserts was far in excess of what the trial court's judgment found to be the property's annual fair market rent.  He

contends that if they are unable to agree to fair lease terms, he will be forced to disrupt his business and move his operations, which will be in no one's interests. He therefore requests that the trial court's allocation of the Ballard property be reversed and be remanded with instructions that the property be awarded to him.

¶ 44     A reviewing court applies the manifest weight of the evidence standard to the factual findings of each factor on which a trial court may base its property disposition, but it applies the abuse of discretion standard in reviewing the trial court's final property disposition. *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 205 (2005). A trial court abuses its discretion where no reasonable person would have distributed the property as the trial court did. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 175 (2000).

¶ 45     We agree with Terry that the trial court's resolution of the issue was problematic. Once the trial court determined that the parties could not work together, the trial court should have formulated a way to minimize the parties' interaction. Nonetheless, we note that, at oral argument, Lori's attorney indicated that the parties had been able to enter into a lease agreement through their attorneys. Thus, Terry's concerns that the parties would be unable to reach an agreement and that Harbortown would have to relocate its offices and warehouse are no longer an issue.

¶ 46     Further, we reject Terry's argument that the trial court should simply have awarded the Ballard property to him. This would not address the trial court's concerns of dividing the parties' marital assets equitably and keeping Terry's installment payments at a reasonable level. We hold that the trial court did not abuse its discretion in awarding the Ballard property to Lori.

¶ 47                    D. Trial Court's Division of Marital Estate

¶ 48    The trial court ordered that the marital estate be divided equally. In so ruling, the trial court specifically addressed Terry's claim that he should receive a larger portion of the marital estate because he made greater contributions to it. The trial court stated:

> "Terry argued that he is entitled to a significantly greater share of the marital estate because his contributions were significantly greater than Lori's and should be given substantially more weight. Specifically, Terry asserts that his financial contributions to the marriage and Harbortown 'significantly' outweigh Lori's contributions as a housewife, homemaker, corporate wife, and primary caretaker of the parties' children. Terry's argument ignores that his financial success is the result of a nearly 22-year marital partnership in which Lori's substantial contributions to the family unit allowed Terry to operate Harbortown in a successful manner and to earn and receive millions of dollars a year. '[I]n a long-term marriage, the source of the assets in acquiring marital property becomes less of a factor, and a spouse's role as homemaker becomes greater.' *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 662 (2008). See also *In re Marriage of Scoville*, 233 Ill. App. 3d 746, 758; *In re Marriage of Polsky*, 387 Ill. App. 3d 126, 136 (2008).
>
> This case is directly analogous to *Heroy*, 385 Ill. App. 3d at 661, in which the trial court awarded wife 55% of the marital estate despite the husband's claim that his 'extraordinary' contributions to the marital wealth through his work and his contributions from his non-marital estate entitled him to a larger share of the marital estate. In affirming the trial court's ruling on this issue, the First Appellate District observed that 'financial contribution to the acquisition of marital assets is only one of several factors to be considered by the trial court in determining the equitable distribution of marital assets,'

and the court held that the wife's contributions to the family were granted equal weight under Illinois law. *Id.* at 661-62.

Similarly, here, Terry's argument that Lori somehow contributed less to the marriage as a parent, homemaker, and spouse, and therefore deserves less of the marital property, is without merit. Under Illinois law, this marriage was a partnership and both parties contributed to the marriage and marital estate."

¶ 49 On appeal, Terry argues as he did before the trial court that he should be awarded a larger portion of the marital estate because he made a more significant contribution to Harbortown. He insists that his pre-marital contributions not only far exceeded Lori's, but also served as the indisputable foundation for the parties' accumulation of wealth and assets during the marriage. He further insists that awarding Lori 50% of the marital estate was erroneous because the trial court failed to properly consider the parties' respective economic circumstances and the substantial income-producing assets that were allocated to Lori.

¶ 50 A trial court's distribution of marital property will not be reversed absent a showing that the trial court abused its discretion. *In re Marriage of Klose*, 2023 IL App (1st) 192253, ¶ 30. Illinois courts have found an approximate equality to be equitable, especially in longer marriages. *In re Marriage of Cepek*, 230 Ill. App. 3d 1045, 1048 (1992). Further, an equal distribution of marital property is favored unless the statutory factors demonstrate that such a distribution will be inequitable. *In re Marriage of Moll*, 232 Ill. App. 3d 746, 755 (1992). The relevant statutory factors are set forth in section 503(d) of the Act. 750 ILCS 5/503(d) (West 2022). Among the factors listed in the statute is "the relevant economic circumstances of each spouse when the division of property is to become effective." 750 ILCS 5/503(d)(5) (West 2022).

¶ 51    Here, the parties had been married for 22 years when Lori filed her petition for dissolution in 2016. Our courts have recognized 22 years as a long-term marriage that weighs in favor of an equal division of the marital assets. See *In re Marriage of Scoville*, 233 Ill. App. 3d 746, 758-59 (1992) (where parties had been married for 22 years, trial court abused discretion in awarding 59% of marital estate to husband); *In re Marriage of Heller*, 153 Ill. App. 3d 224, 230 (1987) (wife awarded 50% of marital estate following a 22-year marriage). The record demonstrates that Terry did make substantial contributions to the marital estate. It was for the trial court to weigh those contributions against Lori's contributions in raising the parties' three children. We cannot say that the trial court's decision to weigh them equally constituted an abuse of discretion.

¶ 52    Further, although Terry correctly points out that Lori was awarded many income-producing assets, she will not receive many of her assets for several years due to the installment payment schedule that the trial court ordered. Considering both of these facts together, we also cannot say that the trial court abused its discretion in not placing more weight on the "parties' respective economic circumstances when the division of property [became] effective." Accordingly, we decline to disturb the trial court's division of the marital estate.

¶ 53                            E. Trial Court's Award of Maintenance

¶ 54    The trial court awarded Lori one year of reviewable maintenance of $45,000 per month. In setting the award, the trial court explained:

>     "Given the size of the marital estate, and because the Court is awarding Lori half of the marital estate, the Court would typically find that Lori is not a candidate for maintenance on the basis that she has sufficient marital property to support herself and to meet her needs. However, taking into consideration the nature of the assets and the fact that the majority of the liquid assets will come from Harbortown which will require Terry's cooperation to

transfer, the Court is awarding Lori 1 year of reviewable maintenance. In coming to the conclusion, the Court considered the marital property it allocated to Lori and whether the assets would generate sufficient passive income, without dipping into principal, to support her. *** For the reasons set forth below, the Court believes that Lori will have sufficient assets to meet her needs after she receives her first installment of her share of the value of Harbortown.”

¶ 55    Terry sought reconsideration of the trial court's award of maintenance. The trial court acknowledged that part of the basis for its ruling was erroneous, stating:

“To justify awarding Lori one year of reviewable maintenance, the Court made, in retrospect, an ill-advised attempt at speculating on Lori's cashflow during the one-year period of transition. This was an effort to determine whether Lori would generate income from the assets which would meet or exceed $45,000 per month. As pointed out by both sides in their post-trial motions, the Court's analysis was confusing[] and *** riddled with speculation. Two prime examples of the Court's speculation include the rate of return on investment and the income that will flow to Lori from the Ballard warehouse. With respect to the latter, the Court awarded Lori the Ballard warehouse to help balance the estate by awarding her a high value piece of real property, and to provide her with an income[]-generating asset. However, the Court recognizes that Lori's receipt of rent from Terry requires cooperation from Terry, and, as the post-trial motions indicate, the parties are still in dispute as to the amount of rent and the terms of the lease. Until those terms are finalized, Lori cannot calculate how much income (after deducting expenses) she will receive monthly from the Ballard property. Consequently, the Court's discussion of potential rental income was not tethered to reality.”

Nonetheless, the trial court declined to reconsider its ruling. The trial court explained that in a year there would be no need for speculation because it would know whether Lori was generating $45,000 a month from her awarded assets.

¶ 56    A trial court's decision setting maintenance is reviewed for an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24. A trial court's factual findings regarding maintenance may be reversed when they are against the manifest weight of the evidence. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 30.

¶ 57    The trial court's rationale for awarding maintenance was to ensure that Lori would have a monthly flow of income until she began receiving her portion of the marital assets. The trial court noted that the parties had difficulty working together, evident through their disputes regarding the lease for the Ballard property, and that Lori receiving her assets from Harbortown was based on Terry's cooperation, which the trial court found was uncertain. We thus do not believe that the trial court abused its discretion in setting a short period of maintenance until Lori received her assets.

¶ 58    We further note, however, that the trial court explicitly determined that Lori would "have sufficient assets to meet her needs after she receives her first installment of her share of the value of Harbortown." Additionally, the trial court based its decision on the fact that Lori's monthly income would be uncertain until the terms of the Ballard lease property were set. At oral argument, Lori indicated that the terms of that lease have now been set. Given this, we remand for the trial court to determine when Lori began receiving her assets and, depending on when she received those assets, whether Terry is entitled to any retroactive relief.

¶ 59    We additionally note that Terry argues that $45,000 a month for maintenance was excessive. He contends that, based on the record, Lori's monthly expenses could not be more than

$39,844. As such, he contends that the trial court's monthly maintenance award was in excess by at least $5,156.

¶ 60    Although in many cases a discrepancy of just over $5,000 a month (potentially $61,872 for the 12 months during which maintenance was ordered) would be a significant amount, in this case it is not. As the marital estate here is valued at $84.6 million, the $61,872 Terry complains about (which may be reduced on remand), constitutes just .07% of the marital estate. That amount is *de minimus* and does not deserve our further consideration. See *In re Marriage of Alexander*, 369 Ill. App. 3d 192, 205 (2006) (mistake in property valuation that equaled less than one-half of percent of the value of the marital estate was *de minimus* as it did not "significantly affect the division of marital property to mandate a reversal and remand for the redistribution of marital property").

¶ 61            F. Trial Court's Classification of an IRA Account as Marital

¶ 62    At the time of trial, Terry was the owner of a Fidelity IRA with an approximate value of $4,607,752. This account was established during the marriage. Terry testified that 68.9% of the funds contained in the account were his non-marital property, as they were rolled over from previous non-marital accounts dating back to an account first started in 1988 before the parties' marriage. Terry was able to procure statements for the entirety of the 27-year time period with the exception of 2 time periods: October 7, 2000 to January 1, 2002 and January 1, 2003 to March 2005 (Gap Periods). Terry testified that, from October 2000 onward, he made no deposits into the retirement funds. This was corroborated by the statements he introduced which showed no contributions were made after October 2000.

¶ 63    In addition to his own testimony, Terry offered the expert testimony of Sandor Goldstein to calculate the marital and nonmartial portion of the Fidelity IRA. Goldstein opined that the non-marital portion of the Fidelity IRA was 68.9% or $3,174,741. Although the trial court found

Goldstein credible, it found Terry failed to meet his burden of establishing the nonmarital tracing by clear and convincing evidence. Because of the gaps in the documentary evidence, the trial court explained that it would have to find Terry's testimony credible that he did not deposit any marital funds into the retirement account after October 2000. The trial court explained that Terry lacked credibility on this issue because "[w]hen it comes to financial decisions, Terry has proven that he will take the position that is most advantageous to himself even if that means lying or stretching the truth."

¶ 64 As such, the trial court found the Fidelity IRA to be marital property and allocated approximately $3 million to Lori and $1.6 million to Terry.

¶ 65 Terry argues that the trial court's credibility finding implies that he intentionally withheld the Gap Period statements as they would have otherwise shown marital contributions. He argues that conclusion makes little sense considering he already conceded that 31.1% of the account is marital. He notes that, in determining that he had failed to establish by clear and convincing evidence his non-marital claim, the trial court relied upon *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 55, which provides that even uncontradicted testimony need not be believed if it is "inherently unreasonable." He argues that his uncontradicted testimony was neither "inherently unreasonable or improbable."

¶ 66 Property acquired during the marriage is presumed to be marital, including retirement accounts. 750 ILCS 503(b) (West 2022). Nonmarital property includes "property acquired before the marriage, except as it relates to retirement plans that may have both marital and non-marital characteristics." 750 ILCS 503(a)(6) (West 2022). To overcome the presumption that a commingled retirement asset is marital, the spouse must demonstrate that the pension benefits acquired before the marriage are traceable by clear and convincing evidence. 750 ILCS 503(b)(2)

(West 2022). Clear and convincing evidence "leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question." *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995). Any doubts regarding that characterization of property are resolved in favor of finding that the property is marital. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 45.

¶ 67     This court will not disturb the trial court's classification of property as marital or non-marital unless the decision was against the manifest weight of the evidence. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 52. Witness credibility and the resolution of conflicts in evidence are matters within the discretion of the trial judge and should not be disturbed upon review. *Stuhr*, 2016 IL App (1st) 152370, ¶ 55.

¶ 68     Here, whether Terry provided clear and convincing evidence that 68.9% of the Fidelity IRA was nonmarital ultimately comes down to whether or not the trial court believed Terry's explanation as to what the missing documents would show. The trial court's explicit finding that he was not credible is consistent with its earlier findings that "Terry's credibility with the court was impacted by his willingness to rewrite facts to suit his narrative" and "[t]he impact of Terry's revisionist history is that the Court is not able to give him the benefit of the doubt when he asks the Court to take his word on certain issues." Just because Terry's testimony was not "inherently unreasonable or improbable" does not mean that the trial court had to accept it, especially considering its observations of Terry's conduct throughout the proceedings. See *id.* As such, we cannot say that the trial court determination that the entirety of the Fidelity IRA was marital property was against the manifest weight of the evidence. See *Brill*, 2017 IL App (2d) 160604, ¶ 52.

¶ 69                    G. Trial Court's Award of Attorney and Expert Fees to Lori

¶ 70    The trial court granted Lori's request that Terry be ordered to pay a portion of her attorney fees, stating:

> "[T]he court is persuaded that Terry, as the party in possession of the pertinent Harbortown records, initiated and embarked upon a relentless and pervasive campaign to prevent Lori from having access to the Harbortown financial records.  But for the perseverance of Lori's counsel and the availability of the Court's contempt power, Terry would not have produced the financial records.  And of course, it was only once Lori had access to these records, that Terry's dissipation of marital assets and unbridled spending was brought to the Court's attention.  And despite the entry of Court orders, Terry continued to spend marital funds without consideration of the Court's orders.  For this reason, the Court is granting Lori's petition for contribution on a percentage basis.  The Court orders Terry to pay Lori 20% of her attorney's fees, $768,315.79 (i.e 20% of $3,841, 578.93).  The payment is due 30 days after the Judgment becomes final."

¶ 71    In her motion for reconsideration, Lori pointed out that the trial court's contribution award made no provision for her expert fee.  Upon reconsideration, the trial court ordered Terry to contribute to Lori's expert fees, explaining:

> "Regarding Mr. Bart's expert fees, the Court notes that Terry went to great lengths in order to prevent Lori's expert from getting access to Harbortown's financial records, that the eventual disclosure of those records led to the discovery of meritorious claims against Terry, and that the court relied on numerous aspects of Mr. Bart's analysis (with some notable exceptions) for purposes of formulating its own valuation of Harbortown. Terry does not call into question the reasonableness of Mr. Bart's fee, only that it would be unfair to penalize him twice-over for the same wrongful conduct.

In light of the Court's prior conclusion that Terry's refusal to turn over Harbortown records needlessly complicated and increased the cost of litigation, Terry's argument on this issue is disingenuous. Mr Bart's fee is an expense for Lori that is separate and distinct from the attorney[ ] fees that she incurred. Thus, in the Court's view, it would be unfair to allow Terry to escape the full scope of his obligation to contribute to the expenses incurred by Lori because of his conduct. After further consideration, the Court finds that it erred by not including Mr. Bart's fees. Accordingly, Terry is hereby ordered to pay Lori an additional $343,925.50 within 30 days of entry of the order (*i.e.* 50% of Mr. Bart's $687,851 fee)."

¶ 72 Terry argues that the record reflects the complex and heavily litigated nature of the proceedings and that both parties participated in the contentious discovery process. He contends, contrary to the trial court's findings, that he began producing financial records for Harbortown as early as February 17, 2017. He points out that no rule to show cause was ever issued against him, and he was never held in contempt relating to the production of Harbortown's financial records.

¶ 73 The trial court may consider a party's misconduct when determining whether to award attorney fees. *In re Marriage of Hale*, 278 Ill.App.3d 53, 58 (1996). The trial court's decision to award attorney fees will not be disturbed absent an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 13. A trial court abuses its discretion only where its ruling is arbitrary, fanciful or unreasonable or where no reasonable person would take the view adopted by the trial court or where its ruling rests on an error of law. *In re Marriage of Iqbal & Khan*, 2014 IL App (2d) 131306, ¶ 44.

¶ 74 The trial court was clearly in the best position to determine whether Terry "needlessly complicated and increased the cost of litigation" or both parties were equally culpable in causing

the divorce proceedings to stretch out for six years. Based on our review of the record, we cannot say that the trial court's ruling was "arbitrary, fanciful or unreasonable" or that "no person would take the view adopted by the trial court." *Id*. We therefore cannot say that the trial court abused its discretion in ordering Terry to contribute to Lori's attorney and expert fees.

¶ 75                    H. Trial Court's Award of 2019 Marital Tax Refund to Terry

¶ 76    The record contains several years of the parties' personal income tax returns. The record reveals that for 2019 Terry filed a return as married, filing separately, and had a federal income tax overpayment of $475,480 and an Illinois income tax overpayment of $21,361. Terry's 2020 tax returns were not introduced into evidence. In both its judgment and revised judgment, the trial court stated:

> "Terry was entitled to receive a tax refund of $496,841 for the tax year 2019 ($475,480 for
> federal and $21,361 for state). However, Terry decided to apply those refunds to his 2020
> tax returns. The Court finds that these refunds are allocated to Terry and included in his
> award of the marital estate."

¶ 77    Terry argues that when the 2019 marital tax refund was applied to a 2020 marital tax liability, it was error for the trial court to later allocate that amount to him as an asset. Lori responds that because Terry did not introduce the 2020 tax returns into evidence, he failed to establish that the 2019 tax refund had in fact been applied to the 2020 taxes.

¶ 78    Any tax refund received during the marriage is a marital asset, and any tax liability incurred during the marriage is a marital debt. *In re Marriage of Ormiston*, 168 Ill. App. 3d 1016, 1018-19 (1988). As long as the parties are married, the fact that they are living separately "does not change the marital nature of the income of either party, nor does it change the marital nature of the income tax liability on that income." *Id.*

¶ 79    Here, the record reveals that the parties applied their tax refunds to future tax liabilities 20 out of 26 years.  The trial court's determination that this is what Terry did in 2020 therefore was not against the manifest weight of the evidence.  See *Vancura*, 356 Ill. App. 3d at 205 (trial court's factual findings will not be disturbed unless they are against the manifest weight of the evidence).  Once the trial court determined that Terry applied the parties' 2019 tax refund to the parties' 2020 taxes, the 2019 tax refund ceased to be an asset.  *Ormiston,* 168 Ill. App. 3d at 1018-19.  The trial court therefore erred in treating it as an asset to be awarded to Terry.  We vacate that portion of the trial court's judgment treating it as such.  Further, based on this tax refund being improperly treated as an asset of the marital estate, we remand for the trial court to reconsider its division of marital assets.

¶ 80                              I. Trial Court's Award of Loan to Terry

¶ 81    Terry made two loans to Marcel Krawczyk for a total of $114,000.  The loans each carried an interest rate of 5%.  In its original judgment, the trial court found that the loans had a combined remaining balance of $78,000 and awarded the loans as an asset to Terry.  Terry argues that the actual balance of the loans was $42,000, and that this court should modify the judgment to reflect the correct value of that loan.

¶ 82    Lori acknowledges that the correct balance of the loan is less than $78,000.  She indicates that, as of September 9, 2019, Krawczyk owed a principal balance of $92,000.  Between September 9, 2019, and October 7, 2021 (the day the proofs closed), Krawczyk paid $38,000.  Lori suggests that, based on the loans accruing interest at 5%, the actual balance of the loan was near $66,500.

¶ 83    Terry is correct that this court can correct a trial court's calculation mistake where evidence of that mistake is clear.  See *Abbott v. Fluid Power Pump Co.*, 112 Ill. App. 2d 303, 313-14 (1969) (where proper amount of recovery could be calculated on uncontradicted evidence, appellate court

calculated and corrected the same). However, Terry has not provided us with enough information to make a proper calculation as to the balance owed on the loan. Although the record indicates that payments on the loan have been made, the record does not indicate how much of these payments were directed to payment or interest. Absent such information, we cannot determine with certainty what the outstanding balance is. Nonetheless, because Lori acknowledges that the trial court's calculation was incorrect, and because we are remanding for other issues, we also remand for the trial court to determine the correct balance of the Krawczyk loan and to adjust the division of the marital estate as necessary.

¶ 84                        III. CONCLUSION

¶ 85    For the foregoing reasons, we vacate the trial court's order setting Terry's installment payments at 9% interest and reinstate its original order setting those payments at 1% interest. We also vacate the trial court's assignment of the 2019 marital tax refund to Terry as an asset. We remand for the trial court to (1) determine if Terry is entitled to any retroactive relief in relation to the award of maintenance to Lori and to (2) recalculate the balance of the Krawczyk loan and to (3) reconsider its division of marital assets in light of the vacating of its assignment of the 2019 tax refund to Terry as an asset and its recalculation of the balance of the Krawczyk loan. The remainder of the trial court's judgment is affirmed.

¶ 86    Affirmed in part and vacated in part; remanded with directions.